IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 11-CR-2294 |
| | ) | |
| **RICK REESE,** | ) | |
| **TERRI REESE,** | ) | |
| **RYIN REESE,** and | ) | |
| **REMINGTON REESE,** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' MOTION FOR DETENTION AND MEMORANDUM OF LAW

*"I said 'I hope my guns go to Mexico . . . I hope they use them to shoot those crooked motherfu\*\*ing federales in the asshole.'"*

> -**Rick Reese** on July 29, 2011 as he sold a confidential informant (CI) firearms and ammunition he believed would be smuggled to Mexico. *See Attach. 7 at p. 100.*

*"You know bro, if I brought a whole deuce, you know, a military army truck to you in Mexico one of these days with ammo, you still wouldn't have enough ammo, man.*"

> -**Rick Reese** on July 29, 2011 as he sold a CI firearms and ammunition he believed would be smuggled to Mexico. *See Attach. 7 at p. 124.*

*"But I mean, when this happens, it's gonna be fun, it's gonna be like open season man, shoot all the fu\*\*ers you can shoot man, it's gonna be yea, we still have ammo? Keep shooting man, keep shooting . . . [and later on] I think what will happen is all of us free people, freedom loving people . . . will band together in an area, roughly . . . and we'll have to form our own militia . . . there's no other way around it."*

> -**Rick Reese** on July 29, 2011. *See Attach. 7 at pp. 44, 140-41.*

*"That would be good my friend . . . structure [your purchases]."*

> -**Rick Reese** on July 29, 2011 after the CI told Rick Reese that his bosses in Mexico wanted to purchase $24,000 or $25,000 worth of firearms and, therefore, the CI was thinking of spreading the purchases over a three day period. *See Attach. 7 at p. 51.*

*"Uh-huh, they come back to you? . . . I love it man*."

> -**Rick Reese** on July 29, 2011 after the CI told Rick Reese that the Mexican police return any firearms seized in Mexico back to the CI because the CI has paid off the Mexican police. *See Attach. 7 at p. 96.*

*"I want to be able to pull the trigger and go BANG! Not sit there and figure out I need to get another key . . . This is what happens when you let lesbians and, uh, queers run things, sir."*

> -**Rick Reese** on July 29, 2011, telling the CI his feelings about trigger locks. *See Attach. 7 at pp. 31-32.*

*"The feds they uh, jerk him off on his license, you know? He's tried to call this fucking nigg\*\* for about the last week and uh, you know, they're all like 'oh, oh, we are gonna help you, we are gonna help you.' And they don't even answer their phone, you know. That is bullsh\*\*, man."*

> -**Rick Reese** on July 29, 2011, telling the CI his feelings about the federal officials holding up his son's attempted opening of a new gun store in Las Cruces. *See Attach. 7 at pp. 58-59.*

*"[B]e careful on the phone 'cause . . . They're, they're watching our phones . . . you know what I'm saying?" See Attach. 3 at pp 11-12.*

> -**Ryin Reese** on May 19, 2011, as he sees the CI for the first time since 2010.

*"Well, it was only a matter of time . . . So now, uh, now it's Sonora? Now he's going after Sonora or what . . . so you're losing, huh?" See Attach. 3 at pp. 45, 55.*

> -**Ryin Reese** on May 19, 2011, after the CI tells Ryin he is losing the war in Mexico and needs a .50 caliber rifle because Sinaloa Cartel Leader Chapo Guzman is taking over.

*"I think I, I might, maybe I, maybe I can move down to Mexico . . . some place with some beach front, you know?  It's a little too dry in Chihuahua for me . . . but they're racist. They don't like white people."  See Attach. 3 at p. 99.*

   -**Ryin Reese** on May 19, 2011, after selling to the CI firearms and ammunition he believed was going to be smuggled to Mexico.

*"Nah, I'm not worried at all dude. [Laughs] I don't give a fu** . . . I stopped caring . . . there shortly after I took a hundred cc's of . . . suck it the fu** up.  And um . . . yeah . . . then I stopped caring."  See Attach. 2 at p. 61.*

   -**Remington Reese** on April 20, 2011, while he repackaged and concealed two thousand rounds of ammunition, after being told by a CI not to worry because the ammo would be cleaned before it was given to people in Mexico.

*"Just talk to my dad dude.  Um, as long as we do it above the books, you know what I mean?  Cause, the reason that guy down there got in trouble was because he did it no tax, no paperwork . . . Here is the thing brother, if you get more than one pistol in a, within five business days we have to fill out another form that goes, uh . . . and they know exactly what you have.  Whereas with rifles or with just one pistol a week, they don't, uh, they just think you were looking at a pistol.  You know what I mean?"  See Attach. 7 at pp. 25, 27.*

   -**Remington Reese** on July 29, 2011 after being told by the CI that his people in Mexico wanted to spend $24,000 on firearms.

*"[Ryin] carries so many mags 'cause he's kind of hoping someone will come through that door with a gun that he can shoot . . . I'm serious."  "I guarantee you . . . I can do everything that the semi-automatic AR-15 . . . that anyone . . . that two guys can do with full auto."*

   -**Remington Reese** speaking to the CI on April 20 and May 19, 2011.  *See Attach. 2 at p. 33; Attach. 3 at p. 41.*

*"How hard is it to get a passport. . . I need a Mexican passport."*

   -**Remington Reese** speaking to the CI on July 29, 2011.  *See Attach. 7 at pp. 28-29.*

*"We don't have that many competitors anymore since the deal with Columbus so . . . those people down in Columbus dude.  They let dumb shi* . . . the chief of police . . . stupid."*

   -**Remington Reese** speaking to the CI on April 20, 2011, right before repacking

and concealing ammunition he believed was going to be smuggled to Mexico. *See Attach. 2 at pp. 9, 37-38.*

*"Just make sure nothing has my name on it anywhere."*

> -**Terri Reese** on July 7, 2011, as she removed labels from ammunition cases she believed were going to be smuggled to Mexico. *See Attach. 6 at p. 67.*

*"Ryin loves your money . . . and he loves to get paid."*

> -**Terri Reese** on May 27, 2011, while assisting Ryin and the CI order a .50 caliber rifle that believed was going to be smuggled to Mexico. *See Attach. 4 at p. 30.*

*"Do you guys have ever [sic] go down in the interior [of Mexico] more, to get, to go to the pharmacy . . . If you ever do, I'm looking for the Yeduc [diet pills] . . . Can you get it down there? . . . I was down in Mexico, down in Palomas last weekend . . . I go all the time."*

> -**Terri Reese** on May 27, 2011, asking the CI to bring back diet pills from Mexico, after helping order the .50 caliber rifle believing it was going to be smuggled to Mexico. *See Attach. 4 at pp. 48-51.*

*"So it'll be Bryan Wolf . . . [n]ow, you won't give those papers to anybody else, right? 'Cause we don't want his picture put around Mexico."*

> -**Terri Reese** on July 7, 2011, as she and Ryin decide on the name Ryin will use on a fraudulent Mexican driver's license they want the CI to obtain in Mexico. *See Attach. 6 at p. 18.*

## I.      Introduction

Gun dealers in the United States who knowingly arm the Mexican Cartels engage in one of the most serious crimes threatening the security of both sides of the Southwest Border. It is an understatement to say that Mexico is reeling from the roughly 40,000 lives claimed by violence in the last five years. The Reese Defendants, who owned and operated New Deal Shooting Sports ("New Deal"), a federally licensed firearms dealer ("FFL") near Deming, New Mexico, callously contributed to this violence, selling high-powered weapons, assault rifles, and

ammunition to the Mexican Cartels, and individuals who claimed Cartel ties.  As a result, the Reeses find themselves charged in a 30-count federal firearms trafficking indictment that alleges counts of conspiracy, straw purchasing, firearms smuggling, money laundering, and forfeiture of real property and business assets -- serious charges for crimes with life and death implications.

Judges along the borderland have not minced words in decrying such heinous conduct. Judge Brack, in denying all of the defendants' detention appeals in the Columbus, New Mexico firearms trafficking case (which also included a southern New Mexico gun dealer facing fewer charges than the Reeses and lesser statutory maximum sentences), pointedly explained that the Columbus defendants were conspiring "with the dark side" and "feeding the madness south of the border." *Attach. 8*.  United States District Judge Lee Yeakel in Texas recently sentenced a defendant to 30 years in prison for trafficking firearms to Mexico, and unequivocally told a co-defendant: "Unless you did not have a pulse, you would know these guns would be used to kill people." *Attach. 9*.

Judge Brack's words, and those of Judge Yeakel, apply with equal force to the Reese Defendants.  As will be discussed in detail below, Defendants are dangers to the community, and there is no set of conditions that will guarantee their appearances at future judicial proceedings.

## II.     **Background**

### A.     Overview of Firearms Trafficking

As explained in the Indictment, Transnational Criminal Organizations operating in Mexico, oftentimes referred to as Mexican Cartels, rely upon the use of firearms and ammunition to protect their supply of drugs, supply routes, profits, and distribution territory from both law enforcement agents and competing Cartels.  Mexican Cartels represent a ready and lucrative market for firearms and ammunition from the United States.  Mexican Cartels prefer certain

makes, models, and calibers of firearms. These "weapons of choice" are generally semi-automatic versions of military type rifles and pistols. They include .50 caliber rifles (which use .50 caliber ammunition), AK-47 type rifles and pistols (which use 7.62mm ammunition), AR-15 rifles (which use 5.56mm and .223 caliber ammunition), 9mm pistols (which use 9mm ammunition), and other high-powered handguns.

Mexican Cartels desire .50 caliber rifles because they are capable of shooting a target from at least 1,000 meters away, and can shoot through a brick wall or penetrate the engine block of a vehicle. Mexican Cartels desire AK-47 type rifles and pistols because they are: (1) capable of accepting high-capacity magazines; (2) rugged and durable in extreme conditions such as deserts and jungles; and (3) easily convertible to fully-automatic mode, meaning the firearm will continue to load and fire rounds of ammunition as long as the trigger is activated or until the firearm runs out of ammunition.

These firearms, and the ammunition that they use, are not available in Mexico through regular commercial retail channels, but are available in the United States through licensed retail gun shops. Therefore, Mexican Cartels rely on the commercial firearms market from the United States, among other places, to supply their para-military wings and enforcers. Firearms traffickers commonly purchase the firearms and ammunition they smuggle into Mexico from licensed retail gun shops in the United States. Because of their unavailability in Mexico, these firearms and ammunition are worth significantly more in Mexico than in the United States.

A FFL is a business licensed under Chapter 44 of Title 18, United States Code, to engage in the business of dealing in firearms. When a purchaser buys a firearm from an FFL, that buyer must fill out a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Form 4473 (Firearms Transaction Record), which asks for and requires the buyer's true name, current

6

residential address, and other identifying information.  The information on the ATF Form 4473 makes it possible to trace a firearm back to its retail purchaser.  FFLs are required by Chapter 44 of Title 18, United State Code, to maintain these forms in their records.

In addition, ATF Form 4473 asks the purchaser: "Are you the actual transferee/buyer of the firearm(s) listed on this form?  Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you . . . ."  If an FFL or employee of an FFL knows that the individual filling out an ATF Form 4473 is not the actual purchaser of the firearm(s), but is instead purchasing the firearm(s) on behalf of another person, it is illegal for the FFL or an employee to sell the firearm(s) to that individual.

Firearms traffickers often employ "straw purchasers" to buy firearms from licensed gun dealers in the United States.  These straw purchasers are commonly paid to falsely claim on the ATF Form 4473 that they are buying the firearm(s) for themselves, when in fact they are purchasing the firearm(s) on behalf of another. Firearms traffickers commonly acquire firearms through straw purchasers to conceal the true purchaser.  Firearms purchased in furtherance of a firearms trafficking conspiracy are usually purchased in cash to further conceal the true buyer and source of funds.  Firearms traffickers commonly employ multiple straw purchasers to supply them with  their firearms, ensuring that they have more than one source of firearms for distribution to their buyers.  Firearms traffickers also employ multiple straw purchasers to avoid detection by law enforcement because multiple people purchasing smaller amounts of firearms arouse less suspicion than one person purchasing a large amount of firearms.

B.      <u>Overview of the Conspiracy</u>

New Deal was owned and operated by Defendant Rick Reese, his wife, Defendant Terri

Reese, and their two sons, Defendants Ryin and Remington Reese. New Deal, which is just 35 miles from the Columbus Port of Entry, is located on the Reese compound, consisting of the Reese home, their gun store, several outbuildings, and a shooting range.

The 23-page Indictment lays out a firearms trafficking scheme and demonstrates in exacting detail how from April of 2010 to present, Defendants knowingly assisted the Mexican Cartels, and individuals claiming Cartel ties, in straw purchasing an arsenal of high powered firearms and over 7,000 rounds of ammunition to be smuggled to Mexico. Punctuating the Indictment are the overt acts demonstrating Defendants conduct:

- In July and August 2010, Ryin Reese, with the help of his coconspirators, sold eighteen weapons of choice at discounted prices to an individual who arranged to smuggle the firearms into Mexico, where they were transferred into the hands of Mexican Cartel members. *Overt Acts 1-7*. During those purchases, Ryin Reese assisted a straw purchaser in completing ATF Form 4473s, in which the straw purchaser falsely represented that s/he was the actual purchaser of the firearms. *Id*.

- On August 28, 2010, after being notified by law enforcement that one of the eighteen firearms sold during July and August 2010 had been recovered, Terri Reese had the straw purchaser come into New Deal and told the straw purchaser that one of the firearms s/he had purchased had been recovered in Mexico. *Overt Acts 8-9*. Terri further cautioned not to talk on the phones, because she believed law enforcement was listening; and that if the straw purchaser ever told law enforcement about their conversation, Terri would deny everything. *Id.*

- In November 2010, Rick Reese showed an individual associated with a Mexican Cartel a .50 caliber rifle, and told the individual he/she could take the .50 caliber rifle to the top of a mountain to kill people in Mexico. *Overt Act 10*.

- In 2011, while their actions and statements were being recorded, Defendants continued to knowingly assist individuals claiming Cartel ties in straw purchasing sixteen weapons of choice and ammunition they believed were going to be smuggled to Mexico. *Overt Acts 13-33*. In so doing, the Defendants removed labels from boxes of ammunition to ensure that, if ever found in Mexico, the ammunition would not be traced back to Defendants. *Overt Acts 28, 33*. The Defendants also removed ammunition from its original packaging and repackaged the ammunition in black canvas bags to conceal it from law enforcement before giving it to a CI, who Defendants believed was going to smuggle the ammunition to Cartel members in Mexico. *Overt Acts 14, 19, 24, 27*. Defendants further assisted a CI and multiple undercover agents posing as straw purchasers in falsifying ATF Form 4473s. *Overt Acts 17, 21, 22, 25, 31*. Photographs of some of the firearms and ammunition purchased in 2011 from Defendants, including one of the .50 caliber rifles, are attached as *Attachment 10*.

## II.    Legal Standards

The United States seeks detention on the basis that Defendants present a serious danger to the community and risk of flight. Only pretrial detention will reasonably assure the safety of the community and Defendants' appearances at future judicial proceedings.

To determine whether there are conditions that can reasonably assure Defendant's appearance at trial and the safety of the community, the Court shall consider:

(1)    the nature and circumstances of the crime charged;

(2)    the weight of the evidence against the defendant;

(3)    the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and

(4)    the nature and seriousness of the danger to the community or to an individual that would be posed by release.

*See* 18 U.S.C. § 3142(g). The government must prove risk of flight by a preponderance of the

evidence, and dangerousness to another person or the community by clear and convincing evidence. *See United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

**III.     Discussion**

Ian Garland was a southern New Mexico FFL charged this year in a firearms trafficking Indictment similar to the instant one. *See United States v. Villalobos*, *et al.*, D.N.M. 2:11-cr-487 RB. Like the Reese Defendants, he had no criminal history. Like the Reese Defendants, he had significant ties to the community, and had run a business in Chaparral, New Mexico for some time. But also like the Reeses, he was a dirty gun dealer who, blinded by greed, knowingly supplied the Mexican Cartels. Accordingly, both Judge Lynch and Judge Brack ordered him detained as both a flight risk and a danger. *See Attach. 12*.

Full consideration of the § 3142(g) factors point in one direction for the Reese Defendants as well -- detention.

A.     Nature and Circumstances of the Offenses

To begin, offenses involving firearms are immediately placed in a category of cases that are simply more dangerous than others. *See* 18 U.S.C. § 3142(g)(1) (singling out crimes involving firearms, crimes of violence, and crimes involving minor victims); *United States v. Carey*, 578 F. Supp. 2d 190, 192 (D. Me. 2008) (observing that the involvement of firearms factors against release).

This, however, is no run-of-the-mill firearms case. To the contrary, it involves a gun dealing family, who was in control of a vast amount of firearms and the accompanying responsibilities of a FFL in the United States, conspiring to allow the straw purchasing of firearms, as well as the smuggling of those firearms to the true purchasers in Mexico. The inherent dangers of firearms offenses are magnified in straw purchasing cases because straw

purchasers, and the gun dealers who assist the straw purchasers, defeat society's and Congress's attempts to keep firearms out of the hands of those who should not have them.  Courts consistently recognize the dangerousness of these offenses, and sentence such defendants accordingly, even imposing sentences that are well above the top of the guideline range.  *See, e.g., United States v. Jackson*, 2006 WL 3741845, at *2 (3d Cir. Dec. 20, 2006) (unpublished) (finding that a sentence for a straw purchaser at nearly double the top of the guideline range was substantively reasonable because the statutory maximum for a violation of 18 U.S.C. § 924(a)(1)(A) was five years and the district court meaningfully explained why "the guideline range was inadequate in light of the seriousness of the offense, and the need to deter others from committing like offenses").  As one court explained in a firearms straw purchasing case:

> The access to firearms through illegal channels is a problem for law enforcement of immense proportions . . . the sale and transportation of firearms illegally purchased represents a serious crime.  Any sentence of a person such as the defendant utilizing straw purchases to purchase weapons, must be of such a nature to promote respect for the law and provide just punishment for the offense.  Against that background, a sentence at the highest level of the advisory sentencing guideline range is appropriate.

*United States v. Arzu*, 2007 WL 2713908, at *3 (N.D. Ohio Sept. 17, 2007).  As another court observed:

> Whether or not there was a victim, [the defendant] used a false name to purchase three firearms.  The act alone created a significant danger to the public, which is only increased by the possibility that he made the purchase on someone else's behalf – someone who may have had a more serious and more recent criminal history.

*United States v. Elsaddique*, 2007 WL 3230167, at *1 (11th Cir. Nov. 2, 2007) (unpublished).  Moreover, the dangers of straw purchasing heighten when the guns involved are high-powered semi-automatic firearms.

Needless to say, the dangerousness of the offenses redlines when the firearms are straw

purchased in the borderlands of the United States on behalf of the Mexican Cartels, and then

smuggled to the Mexican Cartels.  It should come as no surprise then that the firearms purchased

in this conspiracy, prior to law enforcement proactively investigating the Reeses, have surfaced

in Juarez, Mexico, and the state of Sinaloa Mexico with a shockingly short "time to crime."[1]  It

should also be no surprise that the firearms have not been found in Mexico at hunting lodges and

shooting ranges.  Instead, as demonstrated below, the firearms sold by the Reese's prior to law

enforcement's involvement were smuggled to Mexico and seized after shootouts and along with

tactical gear, sub-machine guns and other weaponry, and narcotics.  What follows is a chart[2]

showing the firearms linked to this conspiracy that have been seized in Mexico thus far, and the

known circumstances of the seizures:

| Firearm | Purchase Date | Recovery Date/Place in Mexico | Circumstances of Seizure |
|---|---|---|---|
| One AK-47 type rifle bearing serial number AB2T-N102432 | July 8, 2010 at New Deal | July 30, 2010, in Sinaloa, Mexico | Mexican military engaged in a shootout with eight suspects, two arrested, additionally seized 10 semi-automatic rifles, 26 magazines, tactical gear, and narcotics |
| One AK-47 type rifle bearing serial number M70AB26515 | August 21, 2010 at New Deal | January 22, 2011, in Juarez, Mexico | Unknown at this time |
| One AK-47 type pistol bearing serial number DC-0646-10 | August 25, 2010 at New Deal | February 15, 2011, in Juarez, Mexico | Mexican law enforcement raid of a home, additionally seized 3 semi-automatic rifles, 2 AK-47 type magazines, and approximately 264 rounds of assorted ammunition |

---

[1]"Time to crime" indicates the amount of time between the purchase of the firearm and its subsequent recovery.

[2]The following chart is based on the information contained in the Affidavit of HSI Special Agent Eddie Pacheco, attached hereto as Attachment 1.

| One AK-47 type pistol bearing serial number DR-2693-09 | August 25, 2010 at New Deal | March 10, 2011, in Juarez, Mexico | Mexican law enforcement arrest, additionally seized 12 AK-47 type firearms, 2 sub-machine guns, and 3 other firearms, 27 assorted magazines, approximately 944 rounds of assorted ammunition, tactical gear, and narcotics |
|---|---|---|---|

The nature and circumstances of the offenses charged weigh heavily in favor of detention.

B.     Weight of the Evidence

The evidence against Defendants is formidable.  To assess this factor at the detention stage, the Court should take judicial notice of the 23-pages of specific allegations set forth in the Indictment.  The Court properly may infer from the number of factual allegations, and the specificity with which they are made, that the evidence against Defendants is strong indeed. Moreover, those allegations do not stand alone; rather, they derive from, and are reinforced with hours of clear audio and video in which Defendants freely discuss their crimes.  To get a sense of this evidence, attached are screen shots from the video recorded during some of the undercover operations.  *See Attach. 11*.  And, as set forth at the beginning of this brief, attached are a sampling of recorded conversations made during the course of the undercover operations which underscore Defendants' callous culpability.  *See Attachs. 2-7*.  While the United States "need not offer all of its evidence" at the detention stage of the proceeding, *Cisneros*, 328 F.3d at 618, suffice it to say that the factual allegations and audio/video recordings will be corroborated by the powerful evidentiary combination of what law enforcement observed during the investigation, as well as cooperator testimony.

Altogether, the weight of the evidence is a factor militating heavily in favor of pretrial detention.

13

C.        History and Characteristics

The most reliable information in the United States' possession concerning Defendants' character and past conduct is the Indictment itself, and the words of Defendants.  The scheme set forth in the Indictment paints a story of corrupt border gun dealers who operated with no concern for the international consequences of their actions, and the fact that they were furthering murder and violence at epic levels in Mexico.  Defendants perpetrated their crimes through a web of lies and deceit -- whether lying on the ATF 4473 firearms purchase forms, lying to federal law enforcement, or attempting to secure fraudulent Mexican passports and driver's licenses -- all of which speak eloquently, and loudly, to Defendants' character.

At the detention hearing, it is anticipated Defendants will emphasize their family and community ties as reasons for pretrial release.  The United States peremptorily responds in three ways.  First, the risk of flight and Defendants' ties to Mexico are apparent, as evidenced by Ryin's and Remington's attempts to secure a fraudulent Mexican passport and driver's license, Ryin's expressed desire to move to Mexico, and Terri's admission that she frequently travels to Mexico.  Second, no matter how strong a defendant's connection to the community may be, their aversion to spending a significant time in federal prison, is significantly stronger.  As discovery is disclosed, and as the reality of the Indictment sinks in, the Reeses' will realize that in addition to lengthy prison time, the government has seized, or is seeking to forfeit, their business, the assets of the business, and their real property.  With this much to lose, the Reeses' aversion to facing these charges will grow exponentially.  Third, and finally, the presence of community ties simply has no bearing on the issue of safety of the community, s*ee, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) – an issue that casts a dark cloud over the borderlands and this case.

In sum, Defendants' history and characteristics only exacerbate, rather than ameliorate,

the Court's concerns about the danger Defendants pose and their risks of flight.

    D.        <u>Nature and Seriousness of Danger to Any Person or Community</u>

As already discussed, the instant offense conduct is dangerous and has international, and life and death implications. Releasing corrupt gun dealers who may have ready access to guns and weaponry and a proclivity to use firearms to arm their own militia should give the Court abundant pause. Moreover, Defendants have proven that they are unable to abide by the laws of this country. The risk, therefore, that Defendants will engage in witness tampering, obstruction of justice, or retreat to their 400-acre plot of land in the mountains of Hillsboro and refuse to come out willingly, is simply too high.

As Defendant Rick Reese himself said:

> *"But I mean, when this happens, it's gonna be fun, it's gonna be like open season man, shoot all the fu\*\*ers you can shoot man, it's gonna be yea, we still have ammo? Keep shooting man, keep shooting . . . [and later on] I think what will happen is all of us free people, freedom loving people . . . will band together in an area, roughly . . . and we'll have to form our own militia . . . there's no other way around it."*

*See Attach. 7 at pp. 44, 140-41*.

As Defendant Remington Reese echoed:

> *"[Ryin] carries so many mags 'cause he's kind of hoping someone will come through that door with a gun that he can shoot . . . I'm serious." "I guarantee you . . . I can do everything that the semi-automatic AR-15 . . . that anyone . . . that two guys can do with full auto."*

*See Attach. 2 at p. 33; Attach. 3 at p. 41*.

Moreover, it cannot be overemphasized that Defendants are charged with crimes under United States laws that have substantial harmful effects on communities in Mexico. There is a significant likelihood that Defendants would continue to do what they have been doing for years to make ends meet -- deal in firearms under the table, which would pose a further danger to the citizens of our southern neighbor. *See United States v. Hir*, 517 F.3d 1081, 1088-89 (9th Cir.

2008) ("Where a defendant is charged with committing a crime under United States law that had a substantial harmful effect on a community overseas, we hold that a court should consider the danger that would be posed to that community if the defendant were released pending trial.").

Accordingly, the dangers Defendants pose to others, and communities at home and abroad, necessitate pretrial detention.

## IV.    Conclusion

Defendants are a danger to the community, and pose serious risks of flight if released, and there is no condition or combination of conditions of release that will adequately address these concerns.  Accordingly, the United States respectfully asks the Court to detain all Defendants pending trial.

Respectfully submitted,

KENNETH J. GONZALES
United States Attorney

**Electronically Filed 9/2/2011**
NATHAN J. LICHVARCIK
MICHAEL NAMMAR
Assistant U.S. Attorneys
555 S. Telshor Blvd., Ste. 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

**Electronically Filed 9/2/2011**
Nathan J. Lichvarcik
Assistant U.S. Attorney

16